775 S.E.2d 399

Denise WRIGHT, Appellant,

v.

PRG REAL ESTATE MANAGEMENT, INC., Franklin Pineridge Associates, and Karen Campbell Individually and in her Representative Capacity as an Agent of PRG Real Estate Management, Inc., Respondents.

Appellate Case No. 2013–002157.
No. 5326.

Court of Appeals of South Carolina.

Heard Jan. 15, 2015.
Decided Filed July 15, 2015.
Rehearing Denied Aug. 20, 2015.

Jordan Christopher Calloway, S. Randall Hood, and Deborah G. Casey, McGowan Hood & Felder, LLC, all of Rock Hill; Whitney Boykin Harrison, McGowan Hood & Felder, LLC, of Columbia; Gerald Malloy, Malloy Law Firm, of Hartsville; and Edward Wayne Ridgeway, Jr., Burriss & Ridgeway, of Columbia, all for Appellant.

Brian Arnold Comer and Christian Stegmaier, Collins & Lacy, PC, of Columbia, both for Respondents.

FEW, C.J.

Two men abducted Denise Wright at gunpoint from the parking lot of the apartment she leased at Wellspring Apartment Complex. Wright filed this lawsuit alleging Wellspring's owners and managers[1] (the respondents) were negligent in providing security and were liable under the South Carolina Unfair Trade Practices Act. *See* S.C.Code Ann. § 39–5–10 to – 180 (1985 & Supp.2014). The circuit court granted summary judgment on both claims, finding the respondents had no duty to provide security for Wright and there was no evidence the respondents engaged in unfair or deceptive acts. We affirm.

## I. Facts and Procedural History

In 2003, Wright leased an apartment at Wellspring, which is part of a planned unit development known as the "Harbison Community Association." Several public walking trails weave through the community. Wellspring and other properties within the community are accessible from these public trails.

---

1. PRG Real Estate Management manages Wellspring, Franklin Pineridge Associates is the owner, and Karen Campbell was the property manager at the time of the incident.

On the night of September 18, 2008, Wright parked her car in Wellspring's parking lot and was walking to her apartment when two men held her at gunpoint and demanded money. When she responded she had none, they forced her to drive them to various automatic teller machines to make withdrawals from her account. After approximately thirty-five minutes, the men fled the car, and Wright called the police. The men have never been identified.

In 2011, Wright filed this action, alleging the respondents were negligent in failing to protect tenants from third-party criminal activity by not (1) providing adequate lighting in the common areas, (2) maintaining the overgrown shrubbery to an appropriate height, and (3) executing its courtesy officer program in a reasonable manner. She also brought an unfair trade practices claim, arguing a Wellspring employee committed unfair and deceptive acts in making statements concerning the safety and security of the apartment complex when Wright filled out her rental application.

The respondents moved for summary judgment on both claims, which the circuit court granted. The court first held the negligence cause of action failed as a matter of law because the respondents had no duty to protect Wright against third-party criminal activity. The court then found Wright presented no evidence the respondents engaged in unfair or deceptive acts.

## II. Standard of Review

Rule 56(c), SCRCP, provides the circuit court shall grant summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." When the circuit court grants summary judgment on a question of law, we review the ruling de novo. *Town of Summerville v. City of N. Charleston*, 378 S.C. 107, 110, 662 S.E.2d 40, 41 (2008). When the circuit court grants summary judgment on a question of fact, we view "the evidence and all inferences which can reasonably be drawn therefrom ... in the light most favorable to the nonmoving party." *Quail Hill, LLC v. Cnty. of Richland*, 387 S.C. 223, 235, 692 S.E.2d 499, 505 (2010) (citation omitted). "[T]he nonmoving party must offer some evidence that a genuine issue of

material fact exists as to each element of the claim." *Chastain v. Hiltabidle*, 381 S.C. 508, 514, 673 S.E.2d 826, 829 (Ct.App.2009). "[I]t is not sufficient for a party to create an inference that is not reasonable or an issue of fact that is not genuine." *Town of Hollywood v. Floyd*, 403 S.C. 466, 477, 744 S.E.2d 161, 166 (2013). We must affirm summary judgment where the non-moving party "fails to ... establish the existence of an element essential to the party's case." *Hansson v. Scalise Builders of S.C.*, 374 S.C. 352, 357, 650 S.E.2d 68, 71 (2007).

### III. Negligence Claim

To prevail on a negligence claim, the plaintiff must demonstrate the defendant owed her a duty of reasonable care. *See Bishop v. S.C. Dep't of Mental Health*, 331 S.C. 79, 86, 502 S.E.2d 78, 81 (1998) (stating "the existence of a legal duty of care owed by the defendant to the plaintiff" is "[a]n essential element in a cause of action for negligence"). The existence or non-existence of a duty is a question of law. *Jackson v. Swordfish Invs., L.L.C.*, 365 S.C. 608, 612, 620 S.E.2d 54, 56 (2005).

Generally, residential landlords do not owe tenants a duty to protect them from the criminal activity of third parties. *Cramer v. Balcor Prop. Mgmt., Inc.*, 312 S.C. 440, 441 S.E.2d 317 (1994) (*Cramer I* ). In *Cramer I*, the plaintiff asked our supreme court "to extend the duty [to provide security] owed by store owners and innkeepers to landlords." 312 S.C. at 442, 441 S.E.2d at 318. The supreme court pointed out store owners and innkeepers have a duty to protect their customers from foreseeable criminal activity because they invite the public onto their premises. 312 S.C. at 442–43, 441 S.E.2d at 318. The court explained this duty is based on the principle that "[o]ne who invites all may reasonably expect that all might not behave" and therefore bears responsibility for any injury resulting from the failure to take reasonable precautions against criminal activity. 312 S.C. at 443, 441 S.E.2d at 318 (quoting *Cooke v. Allstate Mgmt. Corp.*, 741 F.Supp. 1205, 1213 (D.S.C.1990) (applying South Carolina law)). The court concluded, however, there was a "fundamental distinction between the relationships of landlord/tenant and store owner/invitee and innkeeper/guest." *Id.* Accordingly,

the court "decline[d] to find that landlords owe an affirmative duty to protect tenants from criminal activity merely by reason of the [landlord/tenant] relationship." 312 S.C. at 443, 441 S.E.2d at 318–19; *see also Cramer v. Balcor Prop. Mgmt., Inc.,* 848 F.Supp. 1222 (D.S.C.1994) (*Cramer II* ) (relying on *Cramer I* to grant summary judgment on the tenant's negligence claim).[2]

Wright acknowledges landlords do not generally have a duty to provide security services and protect tenants from criminal activity. However, she makes three arguments to support her position that a duty exists under the facts of this case. For the reasons we explain below, we reject these arguments and find the circuit court correctly granted summary judgment.

## A. "Particular Circumstances"

■ In *Cramer I,* the supreme court relied on the nature of apartment complexes as private places not held open to the public. *See* 312 S.C. at 443, 441 S.E.2d at 318 (relying on the fact the complex was "private and only for those specifically invited"); *see also Cooke,* 741 F.Supp. at 1213 ("An apartment complex is not a place of public resort. . . . [and] is of its nature private and only for those specifically invited." (citation omitted)); *Goode v. St. Stephens United Methodist Church,* 329 S.C. 433, 441, 494 S.E.2d 827, 831 (Ct.App.1997) ("'[A]n apartment complex is not a place held open to the public and is instead a private place for only people who are specifically invited."). The *Cramer I* court recognized, however, "A duty may arise under the *particular circumstances* of the individual case based upon a showing of negligence constituting the proximate cause of the loss." 312 S.C. at 443 n. 1, 441 S.E.2d at 319 n. 1 (emphasis added). Wright relies on this language from *Cramer I.* She contends her case presents "particular circumstances" that give rise to a duty to protect her. Specifically, she argues Wellspring is "unique" and "analogous to a retail store or motel" because the "series of walking trails that weave through [Wellspring]" constitute "places to which the

---

2. *Cramer I* and *Cramer II* arose from the same lawsuit. *Cramer I* was "certified to [the supreme court] by the United States District Court for the District of South Carolina," 312 S.C. at 441, 441 S.E.2d at 317, and the district court decided *Cramer II* after the supreme court answered the certified question. 848 F.Supp. at 1224.

public are invited to enter and remain for extended periods." Because of these differences between Wellspring and the typical private apartment complex, Wright argues this case is not controlled by *Cramer I*. In particular, she argues (1) the "manner of access" to Wellspring—through the trails—is different from other apartment complexes because the common areas can be directly accessed by the public; (2) the respondents invited the public to the premises via the walking trails, (3) the respondents could reasonably expect the public to use the common areas—based on the nature and location of Wellspring—and (4) the existence of several public policy considerations. We find none of these circumstances distinguishes this case from *Cramer I*.

First, we find the evidence does not support Wright's assertion that the "rare" nature of Wellspring warrants different treatment from the apartment complexes in *Cramer I*, *Cooke*, and *Goode*. Rather, all the evidence in this case shows Wellspring is private property and its tenants are the only people the respondents specifically invited onto the premises. Under these circumstances, the trails at Wellspring are the same as public sidewalks or streets that adjoin any apartment complex because the trails—like sidewalks and streets—simply allow tenants and their invited guests to access the property. The fact that uninvited people may access the properties from the trails—like sidewalks and streets—does not change the analysis.

Wright argues, however, that Wellspring is different from the type of complex addressed in *Cramer I*, *Cooke*, and *Goode* because "Wellspring is part of the Harbison Community Association," which Wright points out "maintains a series of walking trails that weave through the community," "including one trail that goes directly through Wellspring." We find these arguments and the evidence upon which they are based do not remove this case from the general rule the supreme court explained in *Cramer I*. There, the court focused on whether the apartment owners or managers invited the public onto the premises—not on the physical layout of the apartment building or complex. 312 S.C. at 442–43, 441 S.E.2d at 318–19. In *Goode*, this court relied on *Cramer I* to find the apartment complex owed no duty because the public was not invited. 329 S.C. at 441, 494 S.E.2d at 831. Wright has cited no authority

for focusing on the physical layout of an apartment building or complex as a basis for determining the existence of a duty. *Cf. Cramer I*, 312 S.C. at 443, 441 S.E.2d at 318 ("Tenants in a huge apartment complex, or a tenant on the second floor of a house converted to an apartment, do not live where the world is invited to come." (quoting *Cooke*, 741 F.Supp. at 1213)); *Goode*, 329 S.C. at 442, 494 S.E.2d at 831 (same).

As the circuit court found, therefore, the fact that public streets—or trails—adjoin or even traverse the apartment complex does not remove the case from *Cramer I*. Rather, our inquiry must be whether the respondents invited the public onto the premises.[3]

Wright argues the public was invited onto Wellspring's premises. In support of her argument, she presented evidence that other entities invited the public to use the trails at Harbison, including the trail that goes through the Wellspring property. For example, Wright points out the Harbison Community Association maintains a website on which it advertises to the public the availability of its trails and the South Carolina Department of Parks, Recreation and Tourism advertises on its website the availability of the Harbison trails, describing them as "multiuse trails" that are "within the neighborhoods of Harbison." According to Wright, the Department's website "includes a graphic map of the area with suggested routes for the public" and "describes the experience of an average user of the trails: 'As you walk these well-shaded trails, you pass the backyards of homes.'" The Richland County Conservation Commission also advertises the trails in a brochure entitled "Richland County Trails," which states the Harbison trails are "paved pathways weaving through neighborhoods."

Based on this evidence, Wright argues *Cramer I* does not apply because the public is invited onto Wellspring's premises. We disagree. While there is evidence that these other entities invited the public to use the trails, Wright produced no evidence that these entities invited the public onto Well-

---

3. As we explain below, we find no evidence the respondents invited the public onto the premises. Thus, we do not address the question whether doing so would remove this case from *Cramer I*. Rather, we discuss this for the sole purpose of squarely addressing Wright's argument on appeal.

spring's property. As to the trail that goes through Wellspring, the only evidence in the record indicates this trail is also on public property—not Wellspring's premises. As to the actions of the respondents themselves, Wright presented no evidence they invited the public to use the trails. Viewing this evidence in the light most favorable to Wright, we find this is not Wellspring's invitation to the *public* to use the trails. Additionally, Wright conceded at oral argument the respondents took no action to invite the public onto Wellspring's property.

We find Wright presented no evidence to support a finding the respondents—or anyone else—invited the public onto Wellspring's premises. Therefore, even if Wright's theory is valid—that *Cramer I* does not apply when such an invitation did occur—the facts of this case do not support the theory.

Turning to Wright's third argument, she asserts the unique nature of Wellspring created a duty on the respondents to take measures to exclude the public from the property, such as erecting a fence or posting signs to indicate that Wellspring was private property. We reject this argument for two reasons. First, as previously discussed, the trails do not distinguish Wellspring from homes situated along public sidewalks or streets. Second, the fact that the respondents did not take measures to exclude the public from the property does not take this case out of the *Cramer I* context. Under the facts of this case, their *inaction* may be relevant to whether they breached an otherwise existing duty, but their inaction does not support the existence of a duty. *Cf. Sherer v. James*, 290 S.C. 404, 406, 351 S.E.2d 148, 150 (1986) (holding one who *does* act, even though under no obligation to do so, becomes obligated to act with reasonable care).

Finally, Wright asserts a duty to provide security should be imposed on landlords based on public policy considerations. First, she contends a landlord's "superior knowledge of the crime risk in the area" is a "circumstance" that can establish a duty of reasonable care to guard against the danger posed by third-party criminals. Wright argues "[f]rom a public policy perspective, assigning all responsibility for security to a tenant ignores the fact that a landlord is better positioned to know when and where crimes are occurring." Second, Wright urges

us to recognize that a landlord who retains "exclusive control over common areas, and therefore exclusive ability to care for the common areas, must also have a duty to take reasonable actions to keep those areas reasonably secure." She reasons that when a landlord has exclusive control of common areas, the landlord "is in a far superior position to take steps necessary to secure the premises for the safety of the tenants."

The circuit court rejected these arguments, stating this "is just another way of arguing that a landlord has a duty to protect tenants from the foreseeable risk of criminal activity." We agree.[4]

Because we find the facts of this case indistinguishable from *Cramer I*, we hold the respondents owed no duty to provide security for Wright.

### B. Common Areas Exception

■ Wright argues there are exceptions to *Cramer I* that apply in this case to create a duty of reasonable care. *See Cramer II*, 848 F.Supp. at 1224 (stating that "the court must

---

4. Wright's arguments, which she supports by relying exclusively on out-of-state precedent, are based on rules of law not recognized in South Carolina. *See Martinez v. Woodmar IV Condos. Homeowners Ass'n*, 189 Ariz. 206, 941 P.2d 218, 220 (1997) (stating a duty to protect "exist[s] because of Defendant's status with respect to the land and consequent power to prevent harm by exercising control over its property"); *Johns v. Hous. Auth. for City of Douglas*, 297 Ga.App. 869, 678 S.E.2d 571, 573 (2009) ("A landlord's duty to exercise ordinary care to protect a tenant against third-party criminal attacks extends only to foreseeable criminal acts."); *Hemmings v. Pelham Wood Ltd. Liab. Ltd. P'ship*, 375 Md. 522, 826 A.2d 443, 453 (2003) ("By virtue of its control over the common areas, a landlord must exercise reasonable care to keep the tenant safe . . . from certain criminal acts committed within the common areas."); *Davenport v. D.M. Rental Props., Inc.*, 217 N.C.App. 133, 718 S.E.2d 188, 189–90 (2011) (stating "a landlord has a duty to exercise reasonable care to protect his tenants from third-party criminal acts that occur on the premises if such acts are foreseeable"); *McPherson v. State ex rel. Dep't of Corr.*, 210 Or.App. 602, 152 P.3d 918, 923 (2007) ("[A] landlord has a common-law duty to take reasonable steps to protect tenants in the property's common areas from reasonably foreseeable criminal acts by third persons."); *Tedder v. Raskin*, 728 S.W.2d 343, 348 (Tenn.Ct.App.1987) ("[T]he same standard of care should apply to both the innkeeper and the landlord in the area of liability for injuries to tenants resulting from third-party crimes on the premises.").

determine if an exception to the general rule that South Carolina common law imposes upon a landlord no general affirmative duty to maintain leased premises in a safe condition applies in this case"). Wright relies in particular on the common areas exception, under which a landlord has "a duty to maintain the common areas of a leased property in a safe condition." *Cramer II*, 848 F.Supp. at 1225. This duty applies to areas "for the common use of several tenants," such as "halls, entrances, porches or stairways." *Cooke*, 741 F.Supp. at 1211 (quoting *Daniels v. Timmons*, 216 S.C. 539, 549, 59 S.E.2d 149, 154 (1950)). Wright argues the common areas of Wellspring were in an "unsafe condition" because they were susceptible to criminal activity due to the respondents' failure to maintain its courtesy officer program, provide adequate lighting, and trim the overgrown shrubbery to an appropriate height.

Wright attempts to apply the duty to provide "safe" physical premises—structurally—to the provision of "secure" premises that protect against third-party criminal activity. In doing so, Wright again relies solely upon out-of-state precedent and secondary sources. We find the common areas exception does not apply to the facts of this case.

In *Cooke*, the district court "reject[ed] the application of the 'common areas' exception to criminal activity" because the exception had "never been applied in South Carolina to anything except physical injuries resulting directly from the *condition* of the premises themselves." 741 F.Supp. at 1211. In *Cramer II*, the court addressed the same issue. 848 F.Supp. at 1225. The plaintiff contended "the design and operation of the apartment complex was inadequate due to the lack of fencing around the perimeter, the insufficient lighting, the lack of security guards, and the poor locks on apartment doors." *Id.* The court relied on *Cooke* to find "[the common areas] exception is inapplicable to these facts." *Id.* The court reasoned, "To ... apply the common areas exception to this situation would stretch the exception to the point of swallowing the rule." *Id.* We agree with *Cooke* and *Cramer II*, and hold South Carolina does not recognize a landlord's duty to keep common areas "secure" from third-party criminal activity. Thus, we find the circuit court correctly determined the common areas exception does not apply under these facts.

## C. Affirmative Acts Exception

Wright also contends the affirmative acts exception applies in this case to create a duty of reasonable care. *See Sherer,* 290 S.C. at 406, 351 S.E.2d at 150 (providing that one who undertakes to act, even though under no obligation to do so, becomes obligated to act with reasonable care); *see also Cooke,* 741 F.Supp. at 1209–10 (stating "one who assumes to act, even though under no obligation to do so, may become subject to the duty to act with due care" (citation omitted)). Wright argues a duty was created by three affirmative acts of the respondents: (1) hiring courtesy officers to patrol the premises, (2) providing common area lighting, and (3) trimming the shrubbery throughout the common areas. We disagree. With regard to the courtesy officer program, Wellspring maintained a program under which residents affiliated with law enforcement served as courtesy officers in exchange for a reduced rental rate. The program required courtesy officers to patrol Wellspring's premises for "a minimum of two hours each day" and answer calls from residents reporting a crime. Wellspring gave tenants a "security pager" number in its monthly tenant newsletter and told them to call the number or the Richland County Sheriff's Department "if you see anything suspicious." While nothing in the record reflects Wellspring terminated a courtesy officer, the position was occasionally vacant for various reasons—marriage, death, or the officer no longer being affiliated with law enforcement. When the position was vacant, Wellspring sought a new courtesy officer to fill the position. At the time of Wright's abduction, Wellspring did not have a courtesy officer in place.

 We find the creation of its courtesy officer program did not impose on Wellspring a duty to exercise reasonable care in providing security at the complex. Rather, Wellspring's undertaking to create the program required only that Wellspring maintain the program itself with reasonable care. *See* 65 C.J.S. *Negligence* § 40 (2010) ("A person's duty to exercise reasonable care in performing a voluntarily assumed undertaking is limited to that undertaking. . . . A duty assumed because of a voluntary undertaking must be strictly limited to the scope of that undertaking."); *see also Byerly v. Connor,* 307 S.C. 441, 445, 415 S.E.2d 796, 799 (1992) (finding defendant had no duty to inspect for a latent defect because he had

"undertaken a *limited* duty to use due care to discover structural nonconformity with permits" only (emphasis added)). The record in this case demonstrates the courtesy officer program contemplated times during which no officer would be on duty because the program required only that an officer patrol the complex two hours per day. The program also contemplated there would be times during which the courtesy officer positions would be vacant, and the respondents would seek to fill the position in a timely manner. Thus, the duty the respondents assumed by undertaking to provide a courtesy officer program did not include a general duty to provide security for its tenants. Under the facts of this case, the duty the respondents assumed was limited to exercising reasonable care in maintaining the courtesy officer program, and we find no evidence they failed to exercise reasonable care in fulfilling that duty.

In *Cramer II,* the court held the affirmative acts exception did not apply to facts that are indistinguishable from the facts of this case. 848 F.Supp. at 1224. The plaintiff argued the landlord's conduct of "hiring a 'courtesy officer' to patrol the grounds and then terminating that officer without replacing him" established a duty to exercise due care in maintaining the courtesy officer program—and breach of that duty resulted when the courtesy officer position was left vacant. *Id.* The court found "[the plaintiff] misapprehend[ed] the scope of the affirmative acts exception" because "a stronger connection between the act and the injury" is necessary to establish liability. *Id.* We agree with the reasoning of *Cramer II.* The fact that the courtesy officer position was vacant at the time is a circumstance too attenuated from the kidnapping and robbery of Wright to establish a duty to provide security.

■ Regarding lighting and shrubbery, Wright asserts the respondents provided lighting for the common areas and trimmed the shrubbery throughout the common areas. She contends the respondents had no obligation to provide these services, but because they undertook to do so, they had a duty to act with reasonable care. Wright points to evidence that the respondents provided lighting and maintained the shrubbery in part for security purposes—deterring crime. Wright presented expert testimony that the lighting "was totally

inadequate" and the "overgrown" shrubbery could provide a hiding place for criminals, as it did in Wright's case.

We find neither the provision of lighting nor the trimming of shrubbery around the parking areas and apartment buildings, even if done in part for the purpose of making the premises more secure, gives rise to a duty to provide security. It is inconceivable that any apartment developer would not install lighting and shrubbery around the parking areas and apartment buildings of a complex. The installation of lighting and maintenance of shrubbery serve multiple purposes in addition to increasing security—such as preventing accidental injury and improving aesthetics. If the law recognized these activities as "undertakings" sufficient to impose on developers and apartment managers a duty of reasonable care to provide security services, the rule of *Cramer I* would be swallowed by the affirmative acts exception. We find the installation of lighting and the maintenance of shrubbery did not impose on the respondents a duty to exercise reasonable care in providing security at the complex.

Because we find the respondents had no duty to protect Wright from third-party criminal activity under *Cramer I* and no exceptions to this rule apply, we hold the circuit court correctly granted summary judgment on Wright's negligence claim.[5]

## IV. Unfair Trade Practices Claim

■ Under the South Carolina Unfair Trade Practices Act, it is unlawful to engage in "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C.Code Ann. § 39-5-20(a) (1985). A person who suffers "loss of money ... as a result of ... an unfair or deceptive" act or practice "may bring an action ... to recover actual damages." S.C.Code Ann. § 39-5-140(a) (1985). Wright argues Wellspring's property manager made deceptive statements to her when she filled out her rental application. Specifically, she

---

5. We decline to address the circuit court's ruling that the respondents' conduct did not proximately cause Wright's injuries. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (explaining an appellate court need not address remaining issues when the court's resolution of the issues it does address are dispositive of the appeal).

contends the manager told her Wellspring was a "safe and secure place" and that courtesy officers patrolled the premises. The circuit court found Wright failed to prove these statements constituted unfair or deceptive acts. We agree. The generalized statements that the apartments are safe and secure and are patrolled by courtesy officers—on the facts of this case—simply cannot be unfair or deceptive acts under subsection 39-5-20(a). *See Johnson v. Collins Entm't Co.*, 349 S.C. 613, 636, 564 S.E.2d 653, 665 (2002) ("An act is 'unfair' when it is offensive to public policy or when it is immoral, unethical, or oppressive; a practice is 'deceptive' when it has a tendency to deceive." (citation omitted)); *deBondt v. Carlton Motorcars, Inc.*, 342 S.C. 254, 269, 536 S.E.2d 399, 407 (Ct. App.2000) (stating "[a]n unfair trade practice has been defined as a practice which is offensive to public policy or which is immoral, unethical, or oppressive" and "[a] deceptive practice is one which has a tendency to deceive"). We affirm the award of summary judgment.

## V. Conclusion

The order of the circuit court granting summary judgment in favor of the respondents is **AFFIRMED.**

THOMAS, J., concurs. LOCKEMY, J., concurring in part and dissenting in part in a separate opinion.

LOCKEMY, J., concurring in part and dissenting in part.

I respectfully concur in part and dissent in part. I agree with the majority that summary judgment was proper on Wright's claim under the Unfair Trade Practices Act. I disagree, however, with the majority that summary judgment should have been granted on Wright's negligence claim. Summary judgment must be denied in a negligence case when the non-moving party submits a mere scintilla of evidence. *See Bass v. Gopal, Inc.*, 395 S.C. 129, 134, 716 S.E.2d 910, 912 (2011) ("In a negligence case, where the burden of proof is a preponderance of the evidence standard, the non-moving party must only submit a mere scintilla of evidence to withstand a motion for summary judgment."). I find based on reviewing the record that Wright met that burden here. Oscar Wilde once quipped satirically, "[D]uty is what one expects of others.

. . . ." [6] Applying that literally to the law in this case, Wright presented some evidence that she expected security would be provided and that the respondents accepted the duty to do so. In addition, she presented enough evidence to avoid summary judgement that the breach of that duty was a proximate cause of her abduction. I analyze below why the circuit court's grant of summary judgment to the respondents should be reversed and the case remanded for trial.

## I. Duty

As stated by the majority, landlords generally do not owe an affirmative duty to protect tenants from criminal activity merely by reason of the landlord/tenant relationship. *Cramer v. Balcor Prop. Mgmt., Inc.*, 312 S.C. 440, 443, 441 S.E.2d 317, 318–19 (1994). Nevertheless, "[a]t common law, when there is no duty to act but an act is voluntarily undertaken, the actor assumes a duty to use due care." *Sherer v. James,* 290 S.C. 404, 406, 351 S.E.2d 148, 150 (1986).[7] The recognition of a voluntarily assumed duty in South Carolina jurisprudence is rooted in the Restatement of Torts, which states:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

*Johnson v. Robert E. Lee Acad., Inc.,* 401 S.C. 500, 504–05, 737 S.E.2d 512, 514 (Ct.App.2012) (quoting Restatement (Sec-

---

6. Oscar Wilde, *A Woman of No Importance* 68 (Arc Manor 2008) (1894).

7. The majority cites *Sherer v. James,* 290 S.C. 404, 406, 351 S.E.2d 148, 150 (1986) to refer to this body of law as the "affirmative acts exception." I note that the exact same language from *Sherer* has been cited by this court when applying the "undertaking exception." *See Goode v. St. Stephens United Methodist Church,* 329 S.C. 433, 444, 494 S.E.2d 827, 832 (Ct.App.1997). For purposes of my analysis, I refer to it as the "undertaking" exception.

ond) of Torts § 323 (1965) (footnote omitted)). Section 323 "prescribes a duty of care" for purposes of South Carolina common law. *Sherer,* 290 S.C. at 408, 351 S.E.2d at 150. Specifically, section 323 "establishes a duty on one who undertakes to render services for the protection of another." *Id.* at 407, 351 S.E.2d at 150.

In *Goode v. St. Stephens United Methodist Church,* the appellant—a visitor to an apartment complex who was attacked by a tenant in a common area—sued the complex, asserting it was negligent in failing to provide security. 329 S.C. at 438, 442, 494 S.E.2d at 829, 831. The appellant "argue[d] [the apartment complex] created a duty to protect him from the violent acts of third parties by undertaking to provide security to tenants and their guests." *Id.* at 444, 494 S.E.2d at 832. In support of his argument that the apartment complex owed him a duty, the appellant relied on both the common law "undertaking exception" and section 323 of the Restatement (Second) of Torts. *Id.* at 444, 494 S.E.2d at 832–33. Our court found "no basis for liability under either the Restatement (Second) of Torts nor the common law rule." *Id.* at 445, 494 S.E.2d at 833. In finding no duty was owed to the appellant, we noted the security measures undertaken by the complex—"repairing locks, securing windows, informing tenants of criminal acts occurring in the complex, and routinely inspecting the complex"—"were for the protection of the residents of the complex, not the general public." *Id.* at 444, 494 S.E.2d at 833. Our court also concluded there was no evidence that the security was performed with less than due care, and the appellant could not demonstrate the required element of reliance under section 323 because he admitted he knew the landlord did not provide security at the complex at the time he was attacked. *Id.* at 444–45, 494 S.E.2d at 833.

Unlike *Goode,* I believe Wright presented evidence—sufficient to survive summary judgment—that Wellspring had a duty to protect Wright from violent acts of third parties by undertaking to provide security to its tenants. First, Wellspring undertook to provide some form of security for the protection of its tenants. It is undisputed Wellspring offered a "courtesy officer program whereby a resident who was affiliated with law enforcement received a reduced rental rate to serve as a courtesy officer." In a monthly newsletter to its

tenants, Wellspring provided tenants with a phone number for a "security pager," stated security is a "very top priority," and told tenants to "please call the security pager or Richland County Sheriff['s Department] if you see anything suspicious." Unlike the appellant in *Goode* who failed to show any of the apartment complex's security measures were taken for his protection, the security measures undertaken by Wellspring were for Wright's benefit, as a tenant at the apartment complex.

There was also evidence Wellspring performed its security program with less than due care. Wright stated that before she signed a lease at Wellspring, she asked an apartment manager if Wellspring provided security, and the apartment manager confirmed Wellspring had "security officers on duty." Despite the fact that Wright was informed Wellspring "had security officers on duty," it is undisputed that at the time of her attack Wellspring had no "security" or "courtesy" officers. Similarly, Wellspring informed tenants to call the security pager if they "see anything suspicious"; however, at the time of Wright's attack, it is unclear if anyone answered this pager. The majority finds "the duty the respondents assumed was limited to exercising reasonable care in maintaining the courtesy officer program" and there was "no evidence [the respondents] failed to exercise reasonable care in fulfilling [its] duty." I disagree. I believe by specifically informing Wright that the complex had "security officers" and urging tenants to call the security pager in the event of an emergency, Wellspring undertook a duty to either provide security at the complex, or to take affirmative steps to ensure tenants were aware of the limitations of its security program. If the jury accepts Wright's evidence that Wellspring failed to do either, it could find a failure to exercise reasonable care in the performance of an undertaking.

Next, there was evidence that unlike the appellant in *Goode*, Wright relied on Wellspring's security program when she decided to move to its apartment complex. When asked whether her decision to move to Wellspring was based on any amenities, Wright testified, "I was told that there were security officers on duty. So I felt like [Wellspring] would be a safe place." As previously stated, Wright entered her lease at Wellspring after it informed her that the complex had "securi-

ty officers." Assuming this evidence is somehow insufficient to show reliance under section 323, I would still find a duty exists under this section because there is evidence the deficiencies in the respondents' security program increased the risk of harm Wright ultimately suffered. *See* Restatement (Second) of Torts § 323 (stating a duty can apply to one who undertakes to render services for another's benefit if "(a) his failure to exercise such care increases the risk of such harm, *or* (b) the harm is suffered because of the other's reliance upon the undertaking" (emphasis added)). By not having officers in place to patrol the area or answer the "security pager," the respondents undoubtedly increased the risk that a tenant would be attacked at the complex. As confirmed by William Booth, Wright's "security expert," criminals are less likely to lurk in areas where officers are actively patrolling. Accordingly, I believe Wright presented some evidence establishing a duty owed by the respondents under section 323.

In finding Wright failed to show a duty, the majority relies on *Cramer v. Balcor Prop. Mgmt., Inc.*, 848 F.Supp. 1222 (D.S.C.1994) (*Cramer II* ). I believe that reliance is misplaced. In *Cramer II*, the appellant argued under the "affirmative acts" exception, the landlord's conduct of "hiring a 'courtesy officer' to patrol the grounds and then terminating that officer without replacing him" established a duty to protect the tenant from criminal activity of a third party and a breach of that duty occurred when the landlord failed to replace the terminated courtesy officer. *Id.* at 1224. The court disagreed, finding

[the appellant] misapprehends the scope of the affirmative acts exception. The exception envisions a situation where the act of the landlord leads directly to the injury complained of. The cases which fit this exception are those where there is a stronger connection between the act and the injury, such as where a landlord leaves an apartment door unlocked and a third party enters.

*Id.* at 1224.

*Cramer II* described the "affirmative acts" exception as " 'one who assumes to act, even though under no obligation to do so, may become subject to the duty to act with due care.' " *Id.* (quoting *Cooke v. Allstate Mgmt. Corp.*, 741 F.Supp. 1205,

1209–10 (D.S.C.1990)). Interestingly, Cooke quoted *Crowley v. Spivey,* 285 S.C. 397, 406, 329 S.E.2d 774, 780 (Ct.App.1985), which cited *Roundtree Villas Association, Inc. v. 4701 Kings Corporation,* 282 S.C. 415, 423, 321 S.E.2d 46, 51 (1984)—a case that found a "common law duty of care" arose under section 323 when a lender undertook to repair defects in condominiums. Thus, the source of *Cramer II's* authority for the "affirmative acts" exception has its roots in section 323. Our courts have analyzed section 323 in the context of the common law "undertaking" exception—not the "affirmative acts" exception. *See, e.g., Goode,* 329 S.C. at 444–45, 494 S.E.2d at 832–33; *Sherer,* 290 S.C. at 406, 351 S.E.2d at 150; *Russell v. City of Columbia,* 305 S.C. 86, 89–90, 406 S.E.2d 338, 339–40 (1991). I find this significant because unlike *Cramer II's* "affirmative acts" exception, the common law "undertaking" exception has not been limited to situations "such as where a landlord leaves an apartment door unlocked and a third party enters." For example, in *Goode,* the appellant raised a claim similar to the one Wright has made here that the apartment complex was negligent "in failing to provide security," and our court analyzed the claim under the common law "undertaking" exception and section 323. *See* 329 S.C. at 438, 444–45, 494 S.E.2d at 829, 832–33. Although our court in *Goode* ultimately found the appellant failed to show a duty arose under section 323, the decision was not based on the fact that the exception applies only "where there is a stronger connection between the act and the injury." Therefore, I believe the court in *Cramer II* and the majority are mistaken to the extent they hold the "affirmative acts" exception (a/k/a "undertaking" exception) cannot apply in a situation where a landlord undertakes to provide security for its tenants. I interpret *Goode* to mean a tenant injured by a third party criminal attack at an apartment complex may be able to establish a duty owed by a landlord who has undertaken to provide security pursuant to section 323. Because Wright, in my opinion, presented some evidence as to each of the elements under section 323, I would find such a duty existed here for purposes of summary judgment. Therefore, I believe the circuit court erred in granting summary judgment on the ground that Wright failed to show a duty.

## II. Proximate Cause

Because I believe Wright presented evidence tending to establish a duty under section 323, I next address whether the circuit court erred in finding Wright presented no evidence the respondents' negligence was a proximate cause of Wright's injuries.

"To show the defendant was the proximate cause of the injury, the plaintiff must establish the defendant was both the cause-in-fact and the legal cause of the injury." *Cody P. v. Bank of Am., N.A.*, 395 S.C. 611, 620, 720 S.E.2d 473, 478 (Ct.App.2011). Cause-in-fact may be proven "by showing the injury would not have occurred but for the defendant's negligence," while legal cause "is proved by establishing the plaintiff's injury was foreseeable." *Id.*

While the defendant's negligent conduct "need not be the sole cause of the injury" to establish proximate cause, an injury resulting from a third-party's criminal act may break the causal link between any negligence of the defendant and the plaintiff's injuries:

> Generally, if between the time of the original negligent act or omission and the occurrence of the injury, there intervenes a willful, malicious, or criminal act of a third person producing the injury, and the intervening act was not intended by the negligent actor and could not have been foreseen by him as a probable result of his own negligence, the causal link between the original negligence and the injury is broken, and there is no proximate causation.

*Shepard v. S.C. Dep't of Corr.*, 299 S.C. 370, 375, 385 S.E.2d 35, 37 (Ct.App.1989). "[I]t is not necessary that the actor should have contemplated the particular chain of events that occurred, but only that the injury at the hand of the intervening party was within the general range of consequences which any reasonable person might foresee as a natural and probable consequence of the negligent act." *Cody P.*, 395 S.C. at 621, 720 S.E.2d at 478 (internal quotation marks omitted).

"Ordinarily, legal cause is a question of fact for the jury." *Id.* " 'Only in rare or exceptional cases may the question of proximate cause be decided as a matter of law.' " *Id.* at 621, 720 S.E.2d at 479 (quoting *Ballou v. Sigma Nu General*

*Fraternity,* 291 S.C. 140, 147, 352 S.E.2d 488, 493 (Ct.App. 1986)).

Viewing the evidence in the light most favorable to Wright, I believe she presented a scintilla of evidence that the respondents' negligence was a proximate cause of her injuries. *See Bass v. Gopal, Inc.,* 395 S.C. 129, 134, 716 S.E.2d 910, 912 (2011) ("In a negligence case, where the burden of proof is a preponderance of the evidence standard, the non-moving party must only submit a mere scintilla of evidence to withstand a motion for summary judgment."). First, there is evidence Wright's injury was foreseeable. The respondents' "Courtesy Officer Independent Contractor Agreement" created a relationship between the respondents and the courtesy officers to provide services to prevent certain harms to the tenants. Courtesy officers were required to respond to calls regarding "[d]omestic altercations" and "[c]riminal acts." The fact that there were policies and procedures in place to prevent these harms indicates that the respondents perceived some threat of third party criminal acts directed at its tenants. *See Cody P.,* 395 S.C. at 622, 720 S.E.2d at 479 (relying in part on the defendant's policies and procedures that were "designed to avoid fraud and loss situations" to find an injury was foreseeable).

Wright also presented expert testimony that her injury was foreseeable. *See id.* (relying in part on expert testimony in finding evidence that an injury was foreseeable). Booth testified that, in his opinion, Wright's abduction was a "foreseeable incident." His opinion was based in part on his analysis of various crimes at Wellspring including other crimes in the Wellspring parking lot. For example, between 2007 and the first nine months of 2008, Booth documented fifteen parking lot offenses at Wellspring. Booth testified that in the same parking lot where Wright was abducted, there had been an attempted home invasion and an attempted burglary within the previous two years. There had also been a series of vehicle related crimes over that same period that Booth referred to as "precursor crimes"—incidents that likely would have included crimes against a person had the car's owner been present. While the respondents presented testimony indicating Wright's abduction was not foreseeable, the evidence as a whole yields more than one inference regarding

this issue. *See Oliver v. S.C. Dep't of Highways & Pub. Transp.*, 309 S.C. 313, 317, 422 S.E.2d 128, 131 (1992) ("Only when the evidence is susceptible to only one inference does [the issue of legal cause] become a matter of law for the court.").

Finally, I believe there was evidence the respondents' negligence was a cause-in-fact of Wright's injuries. *See Singleton v. Sherer*, 377 S.C. 185, 203, 659 S.E.2d 196, 206 (Ct.App.2008) ("Causation in fact is proved by establishing the plaintiff's injury would not have occurred 'but for' the defendant's negligence."). Booth testified,

> It is my opinion that had the courtesy officers been there and been patrolling the property as required that the perpetrators in this crime more likely than not would not have been in a position to rob and kidnap [Wright].

*See J.T. Baggerly v. CSX Transp., Inc.*, 370 S.C. 362, 370, 635 S.E.2d 97, 102 (2006) (relying in part on expert testimony when deciding whether a defendant's negligence was a cause-in-fact of the plaintiff's injury). Admittedly, there is no guarantee Wright's attack would not have occurred even if Wellspring had courtesy officers at that time. Nevertheless, it must be remembered that on summary judgment, the non-moving party need only submit a mere scintilla of evidence for her claim to survive. I believe Wright presented evidence that a consistent presence of officers patrolling the area likely would have deterred perpetrators from the area where Wright was abducted. Alternatively, had the respondents taken steps to inform Wright that "security officers" were not on duty at the complex, one inference from the evidence is Wright likely would not have been in a position to be attacked. This inference is supported by Wright's testimony that the day after her attack, she asked a Wellspring representative: "Where are these security officers that are supposed to be walking the beat?" Therefore, I believe there is evidence showing the respondents' negligence was a cause-in-fact of Wright's injuries.

Reviewing the evidence in the light most favorable to Wright, I believe she presented some evidence that the respondents' owed her a duty and the respondents negligence was a proximate cause of her injuries. I want to make clear

that I am not making a finding that the respondents were negligent or that their negligence was a proximate cause of Wright's injuries. I simply feel there is a scintilla of evidence in the record from which a jury could find in favor of Wright as to those issues. Whether it will "pass with relief from the tossing sea of Cause and Theory to the firm ground of Result and Fact," [8] should be decided at trial not with summary dismissal. Therefore, I would reverse the circuit court's grant of summary judgment on Wright's negligence claim and remand for further proceedings.

---

8. Sir Winston S. Churchill, *The Story of the Malakand Field Force* 36 (Arc Manor 2008) (1898).